2026 IL App (1st) 240772-U

No. 1-24-0772

Order filed August 12, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 2580 |
| | ) | |
| LAVANGELIS POWELL, | ) | Honorable |
| | ) | Thomas Hennelly, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's petition for postconviction relief alleging ineffective assistance of trial counsel was denied following a third-stage evidentiary hearing. The trial court's judgment was not against the manifest weight of the evidence and the trial court was not biased against defendant. Affirmed.

¶ 2    Defendant Lavangelis Powell sought postconviction relief pursuant to the Post-Conviction Hearing Act (Act), 725 ILCS 5/122-1 *et seq.* (West 2018), alleging that he did not receive the constitutionally guaranteed effective assistance of counsel at trial. Specifically, he claimed that

trial counsel failed to investigate and present alibi witnesses that would have shown he could not have been involved in the shooting that precipitated his conviction for attempt first degree murder. That petition was advanced to a third-stage evidentiary hearing after which the trial court denied defendant's petition. Defendant now appeals, arguing that the trial court's bias denied him a fair hearing and that the trial court's judgment was against the manifest weight of the evidence.

¶ 3      For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 4                                I. BACKGROUND

¶ 5                             A. Trial and Direct Appeal

¶ 6      After a jury trial, defendant was convicted of the attempted murder of Dejuan Robinson. We affirmed defendant's conviction on direct appeal. *People v. Powell*, 2017 IL App (1st) 161443-U. The trial testimony revealed that, on December 6, 2012, defendant was driving a van with codefendant Larry Southern in the passenger seat. When the pair observed Robinson riding a bicycle, defendant maneuvered the van to cut off Robinson. Codefendant Southern then stepped out of the vehicle and shot Robinson nine times. Robinson was left a quadriplegic as a result of his injuries.

¶ 7      Robinson testified that he met his friend, Marshawn Green, after school on December 6, 2012. The pair then met up with another friend named "Dlo." Robinson used Dlo's bike to retrieve marijuana from Robinson's house. While riding to rejoin his friends, Robinson observed a black van. As he rode, the van approached him from behind and cut him off. The rear sliding door of the van was open, and Robinson recognized Southern, who he had known since eighth grade, pointing

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

a silver handgun at him. He was also able to observe defendant in the driver's seat, and he claimed defendant looked at him with a smirk on his face. Robinson stated he had known defendant for two years. They saw each other twice a week and sometimes spoke to one another. Both defendant and Southern were members of the Black P. Stone gang.

¶ 8 Robinson fled and heard two gunshots as he ran. He fell to the ground and felt a burning sensation in his neck. While on the ground, Robinson was unable to move his arms or legs. Southern approached and fired two more times. Robinson subsequently identified defendant and Southern in separate photo arrays.

¶ 9 Defendant was arrested on January 12, 2013, when an officer attempted to perform a traffic stop of a vehicle that was driving erratically at a high rate of speed. The vehicle sped up and continued to flee until it crashed. Defendant was taken from the driver's seat and placed under arrest.

¶ 10 The parties stipulated that Dr. Kimberly Nagy would testify that Robinson was diagnosed with quadriplegia at the C5 level, and that blood testing indicated that Robinson had benzodiazepine and cannabinoids in his system, as well as alcohol in an amount less than 10 to 30 milligrams per deciliter.

¶ 11 Green testified for defendant that he observed a dark green van approach Robinson. He was unable to identify the driver and, although he witnessed the shooting, he did not see the shooter. He further testified that he was familiar with Southern and was able to identify him in a photo array, but he did not see the shooter's face.

¶ 12    The jury found defendant guilty of attempt first degree murder and aggravated battery with a firearm. Defendant was ultimately sentenced to 28 years' imprisonment for attempt first degree murder.

¶ 13                              B. Postconviction Proceedings

¶ 14    On July 24, 2018, defendant filed a petition for postconviction relief.[2] After the petition was advanced to the second stage, the trial court denied the State's motion to dismiss and granted defendant a third-stage evidentiary hearing on March 29, 2019.

¶ 15    The evidentiary hearing commenced on June 29, 2023. Aubrianna McCauley testified that she was defendant's girlfriend on December 6, 2012. On that date, she lived in Atlanta, Georgia, but she was in Chicago with defendant. She stated the two had plans to move to Chicago[3] together and that defendant could not have been involved with the shooting because he was with her while they packed. The two were staying at defendant's mother's home on the 7000 block of South Yates in Chicago, and she claimed that defendant did not leave the house all day. Also present that day were defendant's sister, Chantilly, and her son, Ozias, defendant's mother, Joyce Macklin, and defendant's brother, Javon.

---

[2]Defendant's petition does not appear in the record. The remainder of the record is sufficiently complete to allow us to determine the nature of defendant's claims, and the petition's absence does not frustrate our review. The absence of the pleading central to these proceedings, as well as the accompanying affidavits, is perplexing. This absence would have been detected had defendant's counsel provided us with a statement of facts that contained "the facts necessary to an understanding of the case," as opposed to a statement of facts that discussed *only* the third-stage evidentiary hearing. Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020).

[3]McCauley later discussed how the two of them planned to move to Georgia, and how defendant wanted to change his life because there was "too much going on in Chicago." It is not clear whether her first mention of moving to Chicago was a transcription error or she misspoke.

¶ 16    McCauley was presented with a photograph of her and Ozias which was allegedly taken by defendant at 4:15 p.m. on December 6, 2012. The following day, McCauley drove back to Georgia, and she purchased a plane ticket for defendant so he could follow her. After defendant was arrested in January 2013, she assisted defendant in retaining his first attorney, Gregg Smith, including giving Smith a payment at the courthouse. She told Smith that she had flight records and that defendant was with her the day of the shooting. He asked her to forward any documents to him, and she stated that she contacted him once she had done so and she never heard from him again. She later became aware that defendant obtained different counsel, Frank Himel, but she never met him.

¶ 17    On cross-examination, she stated that she never attempted to give Himel the same flight records. However, she stated that defendant asked her if she would be able to provide the flight records if Himel asked for them, and she said yes. When the State asked her if she had the flight records with her in court, she answered negatively. According to McCauley, she emailed Smith the flight records from a laptop that she owned ten years prior using a student email account that she no longer had access to. She further testified that she never attempted to contact Himel on her own.

¶ 18    Chantilly testified that on December 6, 2012, she had a date with her boyfriend and defendant and McCauley agreed to look after Ozias while she was out. During the hours of 2:30 to 5:30 p.m., she was at home with Macklin, defendant, Ozias, and McCauley. She took a forty-minute nap around 4:30 p.m. and defendant was in the house. When she woke up, defendant was still in the house. After she left the house and went on her date, she initiated a video call with McCauley at approximately 8:30 p.m. to check on her son and defendant was still there. After

defendant was arrested, she visited him in jail often and told him she wanted to testify for him at trial. Once Himel began representing defendant, Chantilly talked to Himel multiple times and informed him she wanted to testify. After defendant's trial, she never asked Himel why he had not called her as a witness.

¶ 19    Macklin testified that she worked for the Ford Motor Company on December 6, 2012, and that she was working overnight shifts. She arrived home between 6 a.m. and 6:30 a.m. on December 6, 2012, and no one else was awake. She claimed that defendant, McCauley, Javon, Chantilly, and Ozias were all present in the house at that time. She woke Javon up so he could get ready for school and then made breakfast for everyone else in the house. Around 11 a.m., she went to sleep and woke up at 2:30 p.m. Defendant, McCauley, Chantilly, and Ozias were still in the house and they were still there when she left the house at 4:30 p.m.

¶ 20    Macklin informed Smith that defendant was innocent and that she could testify to defendant's alibi. She claimed that Smith responded by telling her that the State's case was weak and that defendant did not need an alibi defense. Macklin then claimed that Smith wanted defendant to make a deal with the State in exchange for identifying the shooter. She testified that Smith withdrew from the case after defendant declined to identify the shooter—something she believed defendant was unable to do.

¶ 21    After Himel began representing defendant, Macklin provided him with the same information about defendant's alibi. She testified that Himel also told her that the State's case was weak and defendant did not need an alibi. She maintained that she would have testified if Himel asked her to do so.

¶ 22    On cross-examination, Macklin claimed she asked Himel after defendant's trial why he had not called her to testify and he repeated his claim that the State's case was weak. She stated she never told McCauley to contact Smith or Himel, but she gave McCauley's contact information to both Smith and Himel.

¶ 23    The State called Smith to testify in its case-in-chief. Smith testified that he has done criminal defense work for 32 years and estimated he has tried "maybe a hundred, maybe more" cases involving attempt murder or aggravated battery with a firearm. He stated that he met with Macklin on January 14, 2013, and that Macklin was the one who "tendered" to him the retainer fee. He did not ever remember meeting McCauley. He did not remember anyone coming to his office with Macklin other than her husband or someone named Latasha, who he believed was defendant's girlfriend. He added, "I have Latasha written down, but it could be Natasha. It's been so long."

¶ 24    Between January and September 2013, Smith met with Macklin multiple times and visited defendant in jail multiple times. Smith testified that his notes did not reflect that anyone ever told him of any potential witnesses and defendant never told him that McCauley could testify for him.

¶ 25    Smith stated that defendant's girlfriend, someone named "Latasha or Natasha,"[4] came to court multiple times with another unnamed man and no one ever informed him that they could testify to defendant's whereabouts on December 6, 2012.

¶ 26    However, on July 10, 2014, defendant met with Smith and claimed that he was at his nephew's home between 9 a.m. to 6 p.m. or 7 p.m. with Chantilly, Macklin and her husband,

---

[4]At other points during the hearing, this individual was also referred to as "Tasha." For clarity and simplicity's sake, we refer to her as Tasha going forward.

younger brother Jovan, and Tasha. Smith also claimed that on January 16, 2013, defendant claimed that he was in Atlanta at the time of the shooting, but he did not have any witnesses or evidence to corroborate that. Smith claimed that after defendant told him of his whereabouts during the July 10, 2014, meeting, Macklin never came forward to inform Smith she was willing to testify or inform him about any other witnesses.

¶ 27    Smith further testified that he never spoke to Chantilly and had no recollection of anyone ever mentioning her as a possible witness. He also never saw any photographs of McCauley with Ozias, and defendant never told him that he had taken a photograph of the two on December 6, 2012.

¶ 28    On July 16, 2014, Smith met with defendant at the courthouse. Smith could not remember the details of the conversation, but he claimed that defendant began screaming at him and calling him a "punk ass b\*\*\*." After that incident, Smith sought and was granted leave to withdraw. Smith did not have any documentation that he felt needed to be turned over to defendant's subsequent attorney.

¶ 29    On cross-examination, Smith admitted that his notes contained reference to McCauley when defendant initially claimed that he was in Atlanta visiting her at the time of the shooting. He also admitted that he wrote McCauley's name down in some notes taken when he met with Macklin. However, Smith continued to deny ever having met McCauley. He also denied ever receiving any flight information from her.

¶ 30    The State next called Himel, who testified that he had been practicing criminal defense for 27 years. He claimed that during his career, he had tried hundreds of cases, both jury trials and bench trials, involving attempt murder or aggravated battery with a firearm.

¶ 31    He began representing defendant in late 2014. From that time until trial in 2016, defendant never mentioned any witnesses who could testify to an alibi. Himel stated that he communicated with Macklin and defendant's girlfriend, Tasha, frequently. When asked if Macklin ever told him she could testify as an alibi witness, Himel responded by saying, "That she could or that she actually was?" He went on to explain, "I think she would do anything for her son, but I don't think she was an alibi witness for her son. I think she would make herself available to be an alibi." He claimed these beliefs were based on his conversations with Macklin, however he was not asked to provide specifics and did not do so.

¶ 32    He had no recollection of meeting McCauley or Chantilly, and Tasha never offered herself as an alibi witness. No one ever suggested to him that Chantilly could be an alibi witness, either. He also stated that defendant never told him he had any flight records documenting a flight to or from Atlanta on December 6 or 7 of 2012. Himel denied ever telling anyone that defendant's case was "weak."

¶ 33    On cross-examination, Himel maintained that, prior to trial, neither defendant nor Macklin told him that defendant had an alibi. Defendant never told Himel what he was doing on the day of the shooting and never mentioned anything about an airplane ticket. Himel stated his trial strategy was to discredit Robinson's identification based on the amount of time the victim had to observe the driver of the vehicle.

¶ 34    On March 8, 2024, the trial court issued its ruling. The trial court observed that defendant had, at one point or another, endorsed three separate alibis. First, defendant told Smith on January 16, 2013, that he was in Atlanta at the time of the shooting. Second, on July 10, 2014, he told Smith he was at home in Chicago. Finally, the testimony from the evidentiary hearing maintained

that defendant was at home in Chicago, but it was McCauley who was with him, and not the previous individual named Tasha.

¶ 35    The trial court ultimately concluded that McCauley, Macklin, and Chantilly were not believable and that defendant's purported alibi defense was fabricated. The trial court denied defendant's petition, and defendant filed a notice of appeal on April 5, 2024.

¶ 36                                    II. ANALYSIS

¶ 37    The Act provides a mechanism by which a defendant may raise a collateral attack against his or her conviction based on a claim of actual innocence or where there was a substantial denial of his or her rights under the Constitution of the United States, the State of Illinois, or both. 725 ILCS 5/122-1 *et seq*. (West 2018). The purpose of postconviction proceedings is to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on appeal. *People v. Buffer*, 2019 IL 122327, ¶ 12.

¶ 38    The Act sets out a three-stage process for the adjudication of postconviction petitions. *Id*. ¶ 45. At the first stage, the trial court is only required to determine whether a petition is "frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2); *Buffer*, 2019 IL 122327 ¶ 45. A petition is frivolous or patently without merit when it has no arguable basis in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id*. An example of an indisputably meritless legal theory is one which is completely contradicted by the record. *Id*. Fanciful factual allegations include those which are fantastic or delusional. *Id*. at 17.

¶ 39    If a petition is not dismissed as frivolous or patently without merit, the petition advances to the second stage where counsel may be appointed to an indigent defendant and where the State is allowed to file a motion to dismiss or an answer to the petition. *Id*. at 10-11. At the second stage, all allegations not rebutted by the record are taken as true, and a defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If a defendant can make such a showing, the petition is advanced to the third stage, the stage pertinent to this case, where an evidentiary hearing is held and the trial court may engage in fact-finding and credibility determinations. *Id*.

¶ 40    On appeal, defendant raises two separate arguments. First, he claims he was denied due process of law because the trial court demonstrated "an obvious bias against defendant and his counsel," and "acted as a second prosecutor." Second, defendant argues that the trial court's ruling was against the manifest weight of the evidence.

¶ 41                              A. Alleged Judicial Bias

¶ 42    A fair trial is a fundamental right in all criminal prosecutions and a denial of that right is a denial of procedural due process guarantees under both the United States and Illinois Constitutions. *People v. Taylor*, 357 Ill. App. 3d 642, 647 (2005). "The right of a defendant to an unbiased, open-minded trier of fact is so fundamental to our system of jurisprudence that it should not require citation or explanation." *Id*. (quoting *People v. Eckert*, 194 Ill. App. 3d 667, 673 (1990)). This right is rooted in the constitutional guarantee of due process of law and entitles defendants to a fair and impartial trial before a court which proceeds, not arbitrarily or capriciously, but upon inquiry, and renders a judgment only after trial. *Id*. These due process protections apply equally in postconviction proceedings. *People v. Class*, 2025 IL 129695, ¶ 34.

¶ 43 A trial judge is presumed to be impartial, and the party challenging the judge's impartiality bears the burden of overcoming this presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. "Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to events taking place." *Id*. (quoting *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010)). In order to show bias, defendant must demonstrate that the judge displayed "active personal animosity, hostility, ill will, or distrust toward the defendant." *Id*. (quoting *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010)). Erroneous or adverse rulings alone cannot serve as a basis for judicial bias. *People v. Cummings*, 2023 IL App (1st) 220520, ¶ 52; *People v. Anderson*, 2026 IL App (1st) 200462-C, ¶ 242. "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Class*, 2025 IL 129695, ¶ 38 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

¶ 44 Whether a trial judge's conduct requires reversal is reviewed *de novo*. *Romero*, 2018 IL App (1st) 143132, ¶ 96.

¶ 45 Defendant argues that the trial court engaged in multiple behaviors that demonstrate it was biased against defendant and defense counsel and denied him a fair hearing. Among other things, defendant claims the trial court repeatedly made rulings in favor of the State that were contrary to the law, "refused to recognize the obvious bias" of Smith, "repeatedly refused to place of record any rulings favorable to defense counsel or defendant," "repeatedly interrupted defense counsel and incorrectly overruled defense counsel's meritorious objections," and "verbally abused defense counsel." While we need not address every single claim of bias because the record unquestionably

refutes defendant's contentions, we address some of them to exemplify their lack of merit and defendant's attempts to distort the record. We begin with defendant's contention that the trial court verbally abused defense counsel. For context, we quote verbatim from defendant's brief his version of what transpired:

> "[The trial court] verbally abused defense counsel. During defense counsel's examination of Himel, counsel asked Himel to review a document, the prosecutor made a nonsensical objection. The court did not overrule the improper objection. Instead, the judge took the opportunity to question defense counsel and accuse counsel of not knowing 'basic law.' "

¶ 46    The following is what actually transpired:

> [DEFENSE COUNSEL]: I will show you, sir, if I can a portion of Respondent's Exhibit No. 5. Can you take a look at the highlighted part[?]
>
> [THE STATE]: Judge, at this point I am going to object. There has been no showing that this is any part of Mr. Himel's paperwork or—
>
> THE COURT: What is the purpose of doing this, counsel?
>
> [DEFENSE COUNSEL]: I was going to just try to refresh his recollection, Your Honor.
>
> THE COURT: You have to lay a foundation for that. You have to ask him if his memory is exhausted and if anything would refresh it and, if so, what. Go from there. That's basic law.

¶ 47    Laying the foundation that a witness's recollection is exhausted *is* a prerequisite to using a document to refresh the witness's recollection. *People v. Shatner*, 174 Ill. 2d 133, 153 (1996). In essence, defendant argues that the trial court demonstrated its bias against him and defense counsel

because it correctly pointed out defense counsel's failure to adhere to simple, elementary procedure for refreshing a witness's recollection. Nothing about that exchange can be remotely characterized as verbally abusive.

¶ 48 Another telling example is defendant's claim that the trial court was biased on the basis that it "ruled against defendant because the ineffective assistance of counsel claim was not raised in defendant's post-trial motion." Having reviewed the trial court's ruling in this matter, the trial court said nothing of the sort. While the trial court did question defense counsel repeatedly as to why trial counsel's ineffectiveness was not raised as part of posttrial proceedings and then raised on direct appeal, defendant ignores how those questions fit into the context of the trial court's ruling—they were directed at the credibility of defendant's alibi. Himel had allegedly blatantly ignored an alibi that could have exonerated defendant. Yet, defendant did not discharge Himel and complain of his ineffectiveness. Instead, defendant's mother hired him to litigate his direct appeal.

¶ 49 The trial court recited the evidence in great detail during its ruling, and it was explicit in its belief that defendant's alibi, and the testimony of McCauley, Chantilly, and Macklin in support of that alibi, was fabricated. It cited to the fact that defendant gave Smith two different versions of his whereabouts at the time of the shooting, first claiming he was in Atlanta and later claiming he was at home. It further cited the fact that defendant's initial claim about who he was at home with involved the presence of Chantilly, Macklin and her husband, Jovan, Tasha, but not McCauley. To say that the trial court denied defendant's petition because he failed to raise trial counsel's ineffectiveness in a posttrial motion is an inaccurate reading of the record.

¶ 50 Likewise, we do not believe that the trial court's various rulings exhibited any bias or prejudice. It is true that the trial court did overrule some of defendant's objections and sustain

some of the State's objections. It is also true that the trial court overruled some of the State's objections. But that is all they were—rulings on objections. As noted, the fact that the trial court made evidentiary rulings adverse to defendant is not a basis to find bias, even if the rulings were erroneous. *Cummings*, 2023 IL App (1st) 220520, ¶ 52. And nothing about the trial court's rulings reflected animosity or prejudice toward defendant.

¶ 51    It is also true that the trial court interrupted counsel's closing argument numerous times to ask questions. But nothing in the trial court's questioning reflected hostility or bias. For example, focusing on an exchange highlighted by defendant in his brief, the trial court asked defense counsel to focus on his argument rather than rehashing facts in the record which the trial court had read and of which it was already aware. Defense counsel expressed concern about not wishing to annoy the trial court. The trial court responded:

> "You're not annoying me at all, and someone who is zealous is always welcome in my courtroom so please proceed, sir. I don't want you to take my questioning as a sign of annoyance, it is not. It's that as I read all of this, those are questions I have come up with as I read the pleadings, as I read the record, and as I read the testimony. Those are questions I would like answered, that's all."

¶ 52    This exchange encapsulates the trial court's demeanor throughout the hearing. The trial court did not limit defense counsel's ability to argue his position, which, excluding rebuttal, spanned approximately 18 pages of transcript. Some of the trial court's questions challenged defendant's position, but they were not hostile or indicative of overt animus. They were fair and inquisitive, as we would hope a judge faced with a request to vacate a violent felony conviction might be. And defense counsel was always given an opportunity to respond. Even in a few

instances where, from a cold record, we might surmise there was some mild irritation or frustration on the part of the trial court, that does not inherently reveal bias. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 174. In short, our review of the trial court's questioning does not reveal any of the bias or prejudice that defendant claims was self-evident.

¶ 53    Nor can we find any bias evident in defendant's flawed argument that the trial court did not base its ruling on the State's argument but, rather, used its own reasoning to deny defendant's petition. Defendant fails to cite any authority as to how or why this is improper, let alone indicative of bias.

¶ 54    Defendant also complains that the trial court's discussion of the photograph allegedly taken by defendant indicates its bias. The trial court questioned the weight of the photograph, stating that it was a collage of multiple photographs taken at different times in different locations because Ozias was wearing different clothing in some of the photographs and the background of some of the photos differed. Having reviewed the photograph, it is indeed a collage comprised of four different photographs. Two appear to have been taken at the same time because Ozias is wearing the same green shirt. The other two also appear to have been taken together at a different time because Ozias is wearing a green and white striped "onesie." Additionally, the background for the two sets of photographs is entirely different. We fail to see how the trial court's skepticism about the provenance of the photograph and whether it supported defendant's alibi is indicative of bias. Opinions the trial court forms based on the evidence presented do not constitute a basis for a claim of bias unless they display a deep-seated favoritism or antagonism that makes fair judgment impossible. *Class*, 2025 IL 129695, ¶ 38. The nature of the photograph clearly called into question the testimony that defendant had taken it at 4:15 p.m. on December 6, 2012.

¶ 55    In sum, having scrutinized the record in its entirety, we find no indication that the trial court was biased or prejudiced against defendant or defense counsel or that defendant was denied a fair hearing because of it. The trial court was courteous and professional and displayed no overt signs of animosity or ill-will. Other than ordinary evidentiary rulings, defendant was permitted to present his case unimpeded, and after defendant failed to enter a portion of Smith's file into evidence during the hearing, the trial court ruled that it would consider that evidence anyway over the State's objection. The trial court's ruling, as we discuss below, weighed the credibility of the witnesses in a way that was fair and based on the evidence—even if defendant prefers that those credibility determinations were favorable to him.

¶ 56    Defendant has not overcome the trial court's presumption of impartiality and convinced us that the trial court harbored a bias that denied him a fair hearing. If anything, the record supports the opposite conclusion—that defendant received a fair hearing that was decided on its merits and the evidence rather than bias or prejudice. Accordingly, there is no basis to reverse the trial court's judgment in this regard.

¶ 57                              B. Sufficiency of Evidence

¶ 58    Defendant next challenges the trial court's ultimate judgment denying his postconviction petition, claiming that an unbiased trier of fact would have found that defendant made a substantial showing that his constitutional right to the effective assistance of counsel was violated.

¶ 59    At the third stage of the postconviction process, "the burden of proof is upon the [defendant] to show a denial of a constitutional right by a preponderance of the evidence." *People v. Brown*, 2020 IL App (1st) 190828, ¶ 43 (quoting *People v. Coleman*, 2013 IL 113307, ¶ 92). At a third-stage evidentiary hearing, the trial court serves as the finder of fact; it is thus the trial court's

function to determine witness credibility, decide the weight to give to evidence, and resolve evidentiary conflicts. *Brown*, 2020 IL App (1st) 190828, ¶ 43 (citing *People v. Domagala*, 2013 IL 113688, ¶ 34). We afford the trial court this deference because it has the opportunity to observe and hear witnesses at the evidentiary hearing and therefore occupies a "position of advantage in a search for truth" which "is infinitely superior to that of a tribunal where the sole guide is the printed record." *People v. Coleman*, 183 Ill. 2d 366, 384 (1998).

¶ 60    We review the trial court's decision to deny relief following an evidentiary hearing for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. Manifest error is clearly evident, plain, and indisputable. *Id*. A decision is manifestly erroneous when the opposite conclusion is clearly evident. *Id*. "It will not suffice to show that the record will support a contrary decision; rather, if the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 96. When evaluating ineffective assistance of counsel claims, we likewise defer to the trial court's factual findings unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel provided ineffective assistance. *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008).

¶ 61    Defendant's petition alleged that Himel provided ineffective assistance of counsel for failing to investigate defendant's alibi and present alibi witnesses at trial. Criminal defendants are guaranteed the right to the effective assistance of counsel. U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. 1, § 8; *Strickland v. Washington*, 466 U.S. 668, 685 (1984). To sustain a claim of ineffective assistance of counsel, one must show both that trial counsel's performance was deficient, measuring it against an objective standard of competence under prevailing professional

norms, and that but for counsel's deficient performance, there was a reasonable probability that the outcome of the case would have been different. *Strickland*, 466 U.S. at 687, 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. at 694. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id*. at 686. The failure to establish either prong of *Strickland* defeats a claim of ineffective assistance of counsel. *Id*. at 687.

¶ 62    While defendant acknowledges the ordinary deference that would apply to our review of the trial court's factual findings, he argues that we should not defer to the trial court in any way because the trial court's credibility findings were "simply wrong." We disagree.

¶ 63    Defendant contends that this matter is one where the trial court found Himel credible and found defendant's witnesses incredible when the reverse should have been true. He insists that the trial court's belief that the alibi was fabricated was manifestly erroneous. Even if reweighing the evidence was not beyond the scope of our review, we must note that defendant's argument mentions only in passing the inconsistencies in his alibi that helped frame the trial court's credibility determinations.

¶ 64    As Smith testified, defendant's first mention of an alibi to him in January 2013 maintained that he could not have participated in the shooting because he was in Atlanta. Months later, defendant told Smith he was at home in Chicago with a number of people including Chantilly, Macklin and her husband, his younger brother Jovan, and Tasha, who Smith believed was defendant's girlfriend. Defendant did not mention being at home with McCauley. However, as the testimony of defendant's witnesses at the hearing maintained, defendant was at home at the time

of the shooting, except there was no mention of a girlfriend named Tasha—instead, McCauley claimed that *she* was at home with defendant and that she was his girlfriend. These facts are the genesis of the trial court's observation that defendant had three separate, different alibis.

¶ 65    Thus, it is not simply that the trial court found Himel credible and defendant's witnesses incredible. Defendant's witnesses presented evidence of an alibi that was fundamentally different with respect to the individuals present when compared to the two different alibis of which defendant originally informed Smith.

¶ 66    Clearly, there was some testimony that supported defendant's theory that Himel was informed of defendant's alibi and potential witnesses and did nothing. There was also testimony that supported the State's theory and the trial court's conclusion that Himel was not informed of any alibi witnesses to investigate. However, these credibility determinations, especially in light of defendant's multiple shifting alibis, are the purview of the trial court. *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 102 (trier of fact bears the responsibility to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the record). It is thus not our function to second-guess the trial court's decision to find Himel credible when Himel testified that no one ever informed him they could testify in support of defendant's alibi.

¶ 67    As stated above, it is not enough to show that there is evidence to support a contrary outcome. *Wilkinson*, 2022 IL App (4th) 220302, ¶ 96. Here, the evidence was not such that the outcome was manifestly erroneous and the opposite outcome was clearly evident. *Coleman*, 2013 IL 113307, ¶ 98.

¶ 68    As a result of the trial court's credibility findings, defendant could not establish the first prong of *Strickland*, that Himel's performance fell below an objective, reasonable standard. Defense counsel cannot be faulted for not investigating alibi witnesses they do not know exist. See *e.g. People v. English*, 403 Ill. App. 3d 121, 137-38 (defense counsel was not ineffective for failing to call or investigate alibi witnesses of which she was never apprised). The manifest weight of the evidence standard of review asks whether there is evidence in the record that supports the trial court's decision. The answer to that question is yes, and accordingly we must affirm the trial court's judgment.

¶ 69                                III. CONCLUSION

¶ 70    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 71    Affirmed.